UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

ANTHONY T. VERGARA,           )
                              )
    Plaintiff,                )
                              )
    v.                        )   CAUSE NO. 1:10-CV-00341
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                              )
    Defendant.                )

## OPINION AND ORDER

Plaintiff Anthony Vergara appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Court will REVERSE the Commissioner's decision and REMAND the case for further proceedings in accordance with this Opinion.

### I. PROCEDURAL HISTORY

Vergara applied for SSI and DIB in April and May 2006, respectively, alleging that he became disabled as of April 13, 2006. (Tr. 80-82, 86-90.) The Commissioner denied his application initially and upon reconsideration, and Vergara requested an administrative hearing. (Tr. 40-54.) Administrative Law Judge ("ALJ") Yvonne Stam conducted a hearing on August

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

15, 2008, at which Vergara (who was represented by counsel), his wife, and a vocational expert ("VE") testified. (Tr. 19-35.)

On November 5, 2008, the ALJ rendered an unfavorable decision to Vergara, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 12-18.) The Appeals Council denied Vergara's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-8, 194-201.)

Vergara filed a complaint with this Court on October 1, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.) He raises just one argument in this appeal—that the ALJ improperly discounted the credibility of his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 6-9.)

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Vergara was forty-nine years old; had obtained his GED; and possessed work experience as a grocery stocker, ice cream maker, molder, painter, and pipe bender/spot welder. (Tr. 93-100, 188.) He alleges that he became disabled as of April 13, 2006, due to diabetes mellitus, hepatitis C, and depression. (Opening Br. 2.) Nevertheless, at the time of the hearing, he worked as a grocery stocker at Walmart two days a week, eight hours a day. (Tr. 22-23.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 336-page administrative record necessary to the decision.

*B. Vergara's Testimony at the Hearing*

At the hearing, Vergara testified that he lives with his wife and fifteen-year-old stepson.[3] (Tr. 22.) He stated that all he wants to do is close himself in a room and "lay around" all day and that his wife has to "force [him] to do things." (Tr. 24-25, 29-31.) He reported that he has "bad days" two or three times a week, and he admitted to previously attempting suicide. (Tr. 25, 27, 34.)

When asked why he thought he could not work full-time, Vergara cited a lack of energy and his depression. (Tr. 23.) He stated that he has worked two days a week at Walmart during the past year, but that he cannot work more hours due to his fatigue. (Tr. 22-23.) He elaborated that it is very difficult for him to work two days in a row, as he often stays in bed the day after he works because he has no energy. (Tr. 23, 30.)

Vergara reported that he had not been taking his insulin or anti-depressants during the past year because of his financial constraints and lack of insurance. (Tr. 24, 26.) He elaborated that he had twice been denied Medicaid and that he could not afford to make even the partial payment required at the Neighborhood Clinic. (Tr. 26, 28.) However, he was approaching his first anniversary at Walmart, which would make him eligible for its employee health insurance program. (Tr. 24-25.)

*C. Summary of the Relevant Medical Evidence*

In 2000, Vergara was diagnosed with hepatitis C. (Tr. 203.) He started treatment for the disease on March 30, 2001. (Tr. 205.) He experienced side effects from the medications and some unusual complications that required additional treatment, making it difficult for him to

---

[3] Vergara's wife also testified at the hearing and essentially corroborated Vergara's testimony. (Tr. 29-31.)

work full time in 2001. (Tr. 205.) His doctor encouraged him to minimize his non-work related activities at the time in order to avoid exhaustion. (Tr. 205.) Vergara's doctor opined that he would finish the treatment and be able to resume normal activities by June 2002. (Tr. 205.)

Four years later, in December 2005, Vergara was hospitalized when he attempted to commit suicide by overdosing on prescription medications. (Tr. 222.) He improved after he was started on Paxil. (Tr. 222.) Dr. Samir Ishak stated in his psychiatric evaluation that Vergara had "poor insight" into taking care of himself and his problems, noting that he had not "checked his diabetes" for about five months and was making "poor choices." (Tr. 232.) Dr. Padmanabhan Narasimban documented that Vergara used to take insulin injections but had recently stopped them. (Tr. 233.) Vergara was diagnosed with polysubstance dependency and mood disorder secondary to substance abuse and was assigned a Global Assessment of Functioning ("GAF") score of 40 to 45.[4] (Tr. 223.)

On December 22, 2005, Vergara was evaluated at Park Center. (Tr. 209-13.) In the examination, Vergara exhibited poor eye contact, was withdrawn, and had a difficult time answering questions. (Tr. 211.) He appeared depressed, had a flat affect, and demonstrated only minimal insight into his problems. (Tr. 211.) He was assigned a diagnosis of major depressive disorder and a rule-out diagnosis of substance abuse, as well as a GAF of 42. (Tr. 211.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

Vergara was treated by Dr. Mark Gresla, his family physician, from December 2005 to May 2006. (Tr. 246-70.) On May 23, 2005, Dr. Gresla penned a letter "To whom it may concern," stating that Vergara had chronic fulminating viral disease of the liver that is exacerbated by diabetes. (Tr. 246.) He reported that Vergara suffers from malaise, hepatomegaly, abdominal pain, and profound fatigue, and, as a result, "frequently is unable to work for any significant period of time." (Tr. 246.)

On June 16, 2006, Park Center completed a report of psychiatric status on Vergara's behalf, reflecting a diagnosis of depressive disorder, NOS, and a current GAF of 50. (Tr. 273-78.) His highest GAF for the past year was also 50. (Tr. 273.) Vergara reported motivation problems due to low energy, but that his mood was "okay"; his affect was flat. (Tr. 274.) His symptoms included depressed mood, low energy, irritability, hypersomnia, and feelings of hopelessness. (Tr. 274.)

On August 24, 2006, Dr. Randal Horton, a state agency psychologist, reviewed Vergara's record and concluded that while his depressive disorder was a severe impairment, it was not expected to last twelve months. (Tr. 280-93.) He opined that Vergara had mild difficulties in maintaining concentration, persistence, or pace, but no restrictions in activities of daily living or in maintaining social functioning. (Tr. 290.) A second state agency psychologist later affirmed his opinion. (Tr. 302.)

That same month, Dr. Richard Wenzler, a state agency physician, found that Vergara could lift or carry ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 294-301.) His opinion was

later affirmed by a second state agency physician. (Tr. 303.)

From January to May 2007, Vergara was treated about once a month at the Neighborhood Health Clinic for his diabetes and depression. (Tr. 316-26.) His hepatitis C was also monitored. (Tr. 316-26.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

6

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On November 5, 2008, the ALJ rendered her decision. (Tr. 12-18.) She found at step one of the five-step analysis that Vergara had not engaged in substantial gainful activity since his alleged onset date and, at step two, that his diabetes mellitus and depression were severe impairments. (Tr. 14.)

At step three, the ALJ determined that Vergara's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 15.) Before proceeding to step four, the ALJ determined that Vergara's testimony of debilitating limitations was not credible to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except occasionally climbing, balancing, stooping, kneeling, crouching, crawling, no fast pace, brief and superficial contact with co-workers and supervisors, no contact with general public, simple routine tasks.

(Tr. 16.) Based on this RFC and the VE's testimony, the ALJ found at step four that Vergara was unable to perform any of his past relevant work. (Tr. 17.) The ALJ then concluded at step five that Vergara could perform a significant number of jobs within the economy, including cleaner/maid, marker in retail, and folder in a laundry. (Tr. 18.) Therefore, Vergara's claims for DIB and SSI were denied. (Tr. 18.)

## C. The ALJ's Credibility Determination Will Be Remanded

Vergara's sole challenge to the Commissioner's final decision is that the ALJ improperly discounted the credibility of his testimony of severe fatigue, loss of energy, and other symptoms. Because the ALJ's credibility determination is, in significant part, defied by the record and "patently wrong," it will be remanded.

Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; *Williams v. Astrue*, No. 1:08-cv-1353, 2010 WL 2673867, at *9-10 (S.D. Ind. June 29, 2010); *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); SSR 96-7p. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment—that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; *Krontz v. Astrue*, No. 1:07-cv-00303, 2008 WL 5062803, at *5 (N.D. Ind. Nov. 24, 2008); *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Walker v. Astrue*, No. 4:09-cv-44, 2010 WL 1257441, at *5 (S.D. Ind. Mar. 25, 2010); *Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at *10 (N.D. Ind. Mar. 5, 2010). "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, her determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ concluded that Vergara had an underlying medically determinable physical impairment that could reasonably be expected to produce his alleged symptoms. (Tr. 16.) Accordingly, the ALJ proceeded to step two of the credibility determination process to evaluate the functionally limiting effects of Vergara's alleged symptoms to determine the extent to which they would affect his ability to do basic work activities. SSR 96-7p; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Herron*, 19 F.3d at 334. At step two, the ALJ concluded that Vergara's complaints of severe fatigue and other symptoms were not credible to the extent they were inconsistent with the assigned RFC. (Tr. 16.)

In discounting the credibility of Vergara's complaints, the ALJ heavily relied upon Vergara's noncompliance with his treatment regime, together with his proffered explanation that he did not have insurance and thus could not afford doctor visits or his insulin and anti-depressants. (Tr. 24.) Specifically, the ALJ opined, in relevant part:

10

> Claimant says he does not receive any treatment because he cannot afford it, but already before the alleged onset date he was not taking his insulin. He says he applied for Medicaid twice and was turned down, appealed once, and did not get help appealing. He has been working part-time at Wal-Mart but apparently not taking advantage of the medical program: neither any insurance offered to part time employees nor the discounted drug program providing many drugs at about $6 per month available to the general public. He also is not seeking free care, nor making any effort to maximize his health, even though he has used the ER for other complaints . . . . He talks about "extreme fatigue", but is not on insulin.

(Tr. 17.)

Of course, a claimant's "statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed *and there are no good reasons for this failure*." SSR 96-7p (emphasis added); *see Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000) (emphasizing that a good reason may excuse a claimant's failure to follow treatment). Social Security Ruling 96-7p, however, specifically includes a claimant's inability to afford treatment as one of the reasons he may fail to follow a treatment regime: "The individual may be unable to afford treatment and may not have access to free or low-cost medical services." In that vein, "[c]ourts have regularly held that inability to afford treatment constitutes a good reason for not seeking it." *Neave v. Astrue*, 507 F. Supp. 2d 948, 964 (E.D. Wis. 2007) (collecting cases); *see, e.g.*, *Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 545-56 (7th Cir. 2004) (unpublished) (acknowledging that the social security regulations include a claimant's inability to afford health care as a reason not to follow a prescribed course of treatment); *Jablonski v. Astrue*, No. 09 C 3398, 2010 WL 4625451, at *7 (N.D. Ill. Nov. 5, 2010) (reflecting that an inability to afford treatment is a reasonable explanation for a claimant's failure to seek treatment); *Myers v. Astrue*, No. 08 C 6243, 2009 WL 2746245, at *8 (N.D. Ill. Aug. 26, 2009) (same); *see generally Herron*, 19 F.3d at 336 n.11 ("Lack of discipline, character, or fortitude in

11

seeking medical treatment is not a defense to a claim for disability benefits.").

For an ALJ to assign credence to such a proffered explanation, however, the evidence of record must support the claimant's assertion that he could not afford treatment and was denied access to free or low-cost health care. *See Buchholtz*, 98 Fed. Appx. at 546 ("An absence of evidence that a claimant sought low-cost or free care may warrant discrediting his excuse that he could not afford treatment."); *Buford v. Astrue*, No. 3:09-cv-342, 2010 WL 3075015, at *6 (N.D. Ind. Aug. 3, 2010) ("[A]n ALJ may appropriately discount a claimant's argument that he could not afford medical care when there is no evidence that he sought and was denied low-cost or free care."). Here, the record does indeed support Vergara's assertion that he sought, and was denied, access to free or low-cost health care.

As the ALJ acknowledged, Vergara applied for Medicaid twice, but was denied both times; he appealed one of the two denials. (Tr. 16, 24-25.) He also sought and obtained low-cost health care at the Neighborhood Clinic until he could no longer afford to pay the partial payment that the Clinic required. (Tr. 26.) In addition, he sought and received mental health care at Park Center, but was informed in June 2008 that he could not continue services until he paid his $247.40 outstanding balance. (Tr. 336.) Thus, the ALJ's assertion that Vergara was not "seeking free care" is defied by the record. (Tr. 17); *see Nelson v. Barnhart*, No. 06-C-249-C, 2006 WL 3042954, at *8 (W.D. Wis. Oct. 24, 2006) ("[E]ither when applying the non-compliance regulation directly, or when making a credibility determination, the ALJ must ground in the record any adverse conclusion he draws from the effects of and reasons for a claimant's failure to comply with recommended treatment.").

Furthermore, the ALJ was "patently wrong" when she discounted Vergara's credibility

12

for his failure to take advantage of the employee health insurance at Walmart. *See Powers*, 207 F.3d at 435; *Carradine*, 360 F.3d at 754. The Commissioner concedes that the ALJ erred in this respect, as Vergara testified at the hearing that he was not eligible to participate in the employee insurance program until his first anniversary at Walmart, which had not yet occurred. (Tr. 25; Resp. Br. 11.) The Commissioner further concedes that the ALJ did not ask Vergara at the hearing about the purported "$6 per month" drug program that the ALJ believed to be available to the general public at Walmart and, furthermore, that there is no indication in the record that Vergara was aware of such a program. (Resp. Br. 11.) Considering this evidence, the ALJ's discounting of Vergara's explanation for his failure to consistently take his insulin and anti-depressants lacks the support of the record. *See, e.g.*, *Myers*, 2009 WL 2746245, at *8 (remanding credibility determination where ALJ failed to explain why he found claimant's inability to afford treatment was "not very truthful").

Moreover, the ALJ seemingly gave little consideration to the very nature of Vergara's disorder—that is, his depression—in connection with his failure to seek treatment. The Seventh Circuit Court of Appeals has recognized that "mental illness in general . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (internal citations omitted); *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006) ("Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment."). Indeed, as various courts have articulated, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874

F.2d 1116, 1124 (6th Cir. 1989)).

Admittedly, the ALJ provided several other reasons to discredit Vergara. She considered that Vergara is able to independently perform his household chores at a slower rate, including making a bed, cooking, dusting, doing laundry, and grocery shopping. (Tr. 17, 164; *see* 20 C.F.R. §§ 404.1529(c)(3)(i); 416.929(c)(3)(i). She also observed Vergara's admission that he "drinks beer while playing cards," which she considered to be "contraindicated for diabetics." (Tr. 17.) In addition, she considered that he was able to work two days a week at Walmart. (Tr. 16.)

However, in that regard, the daily living activities that Vergara performed were no more than minimal in nature, and thus were not necessarily inconsistent with his complaints of severe fatigue. *See Carradine*, 360 F.3d at 755 (remanding an ALJ's credibility determination where the ALJ failed "to consider the difference between a person's being able to engage in sporadic physical activities and [the claimant's] being able to work eight hours a day five consecutive days of the week"); *see also Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cr. 2005) (same). Likewise, Vergara's work at Walmart two days a week is not necessarily inconsistent with his complaints of severe fatigue and a finding of disability, as dire circumstances can force an individual to perform work activities that he may not be able to otherwise sustain. *Gentle*, 430 F.3d at 867 ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.").

14

In sum, these other reasons cited by the ALJ for discounting Vergara's credibility do not assuage the Court's concern that: (1) the ALJ heavily relied on Vergara's noncompliance with treatment to reach her credibility determination, and (2) the ALJ's findings and analysis concerning Vergara's reason for his noncompliance are defied by the record and are, at least in part, "patently wrong." *Powers*, 207 F.3d at 435; *see Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) ("When the decision of [the ALJ] on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion . . . ."). Therefore, the case will be remanded so that the ALJ may reassess the credibility of Vergara's complaints of debilitating fatigue and other symptoms in accordance with Social Security Ruling 96-7p, and in particular, the reasons proffered for his noncompliance with treatment.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Vergara and against the Commissioner.

SO ORDERED.

Enter for this 26th day of September, 2011.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge